John G. Crist
CRIST, KROGH, BUTLER & NORD, LLC
The Securities Building
2708 First Avenue North, Suite 300
Billings, MT 59101
Telephone: (406) 255-0400
Facsimile:   (406) 255-0697
Email: jcrist@cristlaw.com

*Attorney for Defendant Greehey & Company, Ltd.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| ENERGY INVESTMENTS, INC., a Colorado corporation, and PINE PETROLEUM, INC., a North Dakota corporation, <br><br> Plaintiffs, <br><br> vs. <br><br> GREEHEY & COMPANY, LTD., a Texas limited partnership, <br><br> Defendant. | Case No.  CV-14-13-GF-JTJ <br><br> **BRIEF IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

**<u>Page</u>**

TABLE OF AUTHORITIES ........................................................................... ii

INTRODUCTION AND SUMMARY RESPONSE................................................1

FACTS ...............................................................................................................4

LEGAL ANALYSIS ........................................................................................14

     A.     Montana Rules of Contract Interpretation...........................................14

     B.     The AMI Agreement is Ambiguous Because it Does Not Define What Acres are Prospect Acres..................................................................16

     C.     None of the Lease Acres Acquired Met the Express Terms of the AMI Agreement ....................................................................................20

     D.     Plaintiffs Have Not Established a Right to Prospect Fees on Leases Acquired by Greehey and Shale...........................................................23

CONCLUSION ................................................................................................24

CERTIFICATE OF COMPLIANCE.................................................................25

CERTIFICATE OF SERVICE .........................................................................26

## TABLE OF AUTHORITIES

**Cases:**                                                                    **Page**

Bird v. Glacier Elec. Coop., Inc., 255 F.3d 1136 (9th Cir. 2001) ................21

Briese v. Montana, 2012 WL 4929107 (D. Mont. 2012) (citation omitted)
report and recommendation adopted by 2013 WL 788077 (D. Mont. 2013)..........22

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ..............................................14

City of Austin, Texas v. Decker Coal Co., 701 F.2d 420 (5th Cir. 1983)
(interpreting Montana law) ....................................................................18

Edward v. Prince, 221 Mont. 272, 719 P.2d 422 (1986)..............................18

Holstrom v. Mutual Benefit Health and Accident Association, 139 Mont.
426, 364 P. 2d 1065 (1961)....................................................................15

King Resources, Inc. v. Oliver,  2002 MT 301, 313  Mont. 17,  59 P. 3d  1172
.................................................................................................15

Klawitter v. Dettmann, 268 Mont. 275, 886 P.2d 416 (1994) ......................15

Kominsky v. Dave Smith Chevrolet Oldsmobile Pontiac Cadillac, Inc., 2010
WL 4920903 (D. Mont. Nov 29, 2010) .................................................14

Marriage of Mease, 2004 MT 59, 320 Mont. 229, 92 P.3d 1148.................15

Mary J. Baker Revocable Trust v. Cenex Harvest States Cooperatives, Inc.,
2007 MT 159, 338 Mont. 41, 164 P.3d 851....................................14, 15, 16, 17, 20

Schwend v. Schwend 1999 MT 194, 295 Mont. 384, 983 P.2d 988.............15

Van Hook v. Jennings, 1999 MT 198, 295 Mont. 409, 983 P.2d 995 ¶¶ 13, 16.................................................................................................................15

## Statutes and Rules:

Fed.R.Civ.P. 56(c).............................................................................................14

Fed. R. Civ. P. 56(f) .........................................................................................21

Fed. R. Civ. P. 408 ....................................................................................14, 22

Mont. Code Ann. § 1-4-102 ............................................................................16

Mont. Code Ann. § 28-2-904 ..........................................................................16

Mont. Code Ann. § 28-2-905(1) ...........................................................16, 17, 19

Mont. Code Ann. § 28-2-905(2) ......................................................................16

Mont. Code Ann. § 28-3-202 ..........................................................................18

Mont. Code Ann. § 28-3-402 ..........................................................................15

Restatement (Second) of Contracts § 212 cmt. b (1981).......................................16

## I.   <u>INTRODUCTION AND SUMMARY RESPONSE</u>

This case involves a dispute over whether Greehey & Company, LTD ("Greehey") owes Energy Investments, Inc. and Pine Petroleum, Inc. ("collectively "EII") prospect fees for every single acre acquired by either Greehey or EII in connection with a contract entitled  "Area of Mutual Interest ("AMI") Agreement" (hereafter AMI Agreement").  EII takes the position that it is owed $75/acre for every acre it acquired under the AMI Agreement and $50/acre for every acre that Greehey or its agent, Shale Exploration ("Shale"), acquired even though these leases were acquired without any assistance from EII.  EII reaches this conclusion in two ways.  First, it assumes, without actually saying it, that every single acre that either party acquired under the AMI Agreement is to be deemed a "prospect" for which it is entitled to a fee.  Second, it ignores the facts that prospect fees were to be paid only "subject to the terms of this Agreement", and <u>none</u> of the acres were acquired in compliance with the terms clearly required in the AMI Agreement.[1]

There are numerous, basic fact disputes that preclude summary judgment as to what acres were considered "prospects" under the AMI Agreement. These fact disputes relate both to the meaning of the AMI Agreement and whether EII did what was required to earn a prospect fee under that agreement.

---

[1] As discussed below, Plaintiffs' admitted failure to lease any acres for the amount authorized in the AMI Agreement is grounds for the Court to grant summary judgment in favor of Greehey.

The AMI Agreement, which was drafted by EII/Pine is silent as to what acres acquired are to be deemed prospects, and what acres are not prospects. Because the AMI Agreement does not say what acres are prospects, there is an ambiguity in the contract. That ambiguity is to be construed against the drafter (EII) and it requires the Court to consider parole evidence to interpret the contract. As discussed below, it was never Greehey's intent nor was it the parties' agreement that Greehey would pay EII a prospect fee on every single acre that either party acquired, no matter the terms of the acquisition. This difference in contract intent and interpretation creates a fact dispute that precludes summary judgment.

More specifically, the AMI Agreement allows a prospect fee only if the leases are acquired pursuant to the "terms of the Agreement". The AMI Agreement required that acres be purchased for a maximum bonus payment of $200 or less per net mineral acre, and requires that the terms of the lease include at least a five-year primary term, and at least a two-year option to extend that term. Not a single acre acquired meets both of these terms. And while Greehey agreed to acquire some non-compliant acres, it never agreed to pay prospect fees for such acres.

Plaintiffs simply ignore these contract terms, and contend they were neither told about nor obligated to meet them. Greehey disputes this, contending the terms are plain from the face of the AMI Agreement, and that Greehey told Plaintiffs these were the required terms before the AMI Agreement was ever executed. This

3

fact dispute goes to the heart of Plaintiffs' claims that they are entitled to prospect fees for all of the leases acquired by either party, and precludes summary judgment on this issue.

## II.   FACTS

Sid Greehey is the President of Donco, Inc., the general partner of Greehey & Company, LTD.  GSADF, ¶1. [2]  Greehey, EII and Pine became parties to a contract entitled "Area of Mutual Interest ("AMI") Agreement" ("AMI Agreement") with an effective date of March 22, 2012.  GSADF, ¶2.  A true and accurate copy of that AMI Agreement is attached to Sid Greehy's Affidavit as Exhibit "A".  Id.

Several things occurred before the AMI Agreement was signed.  The term "prospect fee" is commonly used to refer to a geological prospect.  GSADF, ¶23.  It is common in the oil and gas industry that a geologist who puts together information to demonstrate that certain areas have the potential to yield oil and gas in commercial quantities (i.e., the area is "prospective") is paid a prospect fee for each acre he identifies as his prospect and on which leases are ultimately obtained. GSADF, ¶23.

Before it ever spoke with Plaintiffs, Greehey and its geological prospect generators, Black Pearl and John Bumgardner, had numerous discussions with

---

[2]  "GSADF" refers to Greehey's Statement of Additional Disputed Facts.  "RPS" refers to Greehey's Response to Plaintiffs' Statement of Undisputed Facts.  The latter includes Plaintiffs' Contentions and Greehey's response to those contentions.

Apache Oil Corporation ("Apache").   GSADF, ¶ 10.   Greehey reached an agreement with Apache by which Apache agreed that it would acquire from Greehey and Shale leases that Greehey and Shale acquired within a designated geographical Area of Mutual Interest (the "AMI"), but only if those leases were acquired on specific terms.   GSADF, ¶¶ 11, 12.   Specifically, Apache agreed to acquire leases only if they provided for a five-year primary term and provided that the Lessee (ultimately Apache) could extend the term of the lease, at its option, for an additional two-year term.   GSADF, ¶13.

These were not meaningless or unimportant terms.   Leases are acquired via a written oil and gas lease.   In the typical case, the mineral owner is paid an up-front lease bonus payment of a certain amount per net mineral acre.   GSADF, ¶ 5.[3]   A typical oil and gas lease agreement also contains a primary lease term and it is highly desirable to obtain an option to extend that primary term.   GSADF, ¶ 7.   In a highly speculative area with large acreage positions it is necessary that the oil company has that option in order to have the necessary time to develop the lease.   GSADF ¶8.   The mineral owner wants the primary term to be reasonable, so that his land is not tied up indefinitely if the oil company does not drill on the property.   GSADF, ¶ 8.   Most mineral owners recognize the benefit of having an extension in

---

[3] A net mineral acre is calculated by dividing the total surface acres leased, by the mineral owner's percentage interest in the minerals.   For example, if there are 10 acres and the mineral owner has a 50% interest in the sub-surface minerals, there are 5 net mineral acres.   GSADF, ¶ 6.

order to get the oil company to drill. Larger oil companies will not drill and discover oil unless they know those efforts will be fully realized. Thus the primary term and extensions are always a critical part of the negotiations with a mineral owner. GSADF, ¶ 9.

Throughout this transaction, Apache never varied its requirement that the leases acquired comply with the five-year primary/two-year option terms. The only exception it made was for a drill site lease that was to be drilled within the year. GSADF, ¶ 14.

Prior to entering into the AMI agreement, Sid Greehey knew Steve Chamberlain, who he understood to be the owner of Energy Investments, Inc. GSADF, ¶ 15. Sid Greehey had a meeting in Denver with Steve Chamberlain where they discussed two other projects, the Southside and Crescent projects, which Greehey was interested in acquiring.[4]   At that meeting, he showed Steve Chamberlain the prospect which ultimately became the subject of the AMI Agreement. GSADF, ¶ 17.

Greehey was later introduced to Steve Pine by Steve Chamberlain in Houston at an oil convention, and was advised that he was the owner of Pine Petroleum ("Pine") and Great Northern. GSADF, ¶ 19. Over the course of these discussions, Pine and Chamberlain represented to Sid Greehey that they had complete lease

---

[4] Greehey ultimately acquired the projects, paying EII $12 Million. GSADF, ¶17.

records for the AMI area.  Based upon that representation, Greehey entered into discussions with these gentlemen concerning a potential deal to acquire oil and gas leases in the AMI.  GSADF, ¶ 20.

Greehey, by the time he signed the AMI Agreement, had already made his deal with Apache.  So he was mindful of the terms under which Apache would acquire leases.  Prior to entering into the AMI, Sid Greehey:

(a)    explained to Chamberlain and Pine the deal Greehey had with Apache and the prospect generators;

(b)    told Chamberlain and Pine that Greehey was not interested in acquiring leases for itself to develop or operate;

(c)    told Chamberlain and Pine that Greehey had the potential to acquire and sell leases to Apache, but only so long as those leases were acquired on specific terms;

(d)    told Chamberlain and Pine that the leases had to provide for a five-year primary term and provide that the Lessee could extend the term of the lease, at its option, for an additional two-year term;

(e)    told Chamberlain and Pine that Apache was not interested in acquiring leases, unless the lease terms were consistent with those terms, and

(f)     told Chamberlain and Pine that, since Greehey was looking to acquire leases for resale to Apache, Greehey was not interested in leases that did not meet Apache's lease terms.  GSADF, ¶ 21.

In connection with the AMI Agreement, EII and Pine wanted to include provisions that would allow them to receive fees on certain acres within the AMI. GSADF, ¶ 24.  The fees that EII and Pine wanted were not geologic prospect fees; they were for mineral owners' lands located within the AMI that EII and Pine had records on, were familiar with and could prospectively acquire a lease on, i.e. a prospect.  GSADF, ¶ 26.

There were two different types of prospect fees that were discussed and later included in the AMI Agreement.  The first related to lease acres acquired by EII/Pine (hereafter "EII Prospects").  The second related to lease acres acquired by Shale Exploration, who was working as an agent of Greehey (hereafter "Shale Prospects").  GSADF, ¶ 28.

As to the EII Prospects, the AMI Agreement did not define what types of acres would qualify as acres on which a prospect fee would have to be paid; it only said that Greehey agreed to pay a $75.00 per net mineral acre prospect fee on every acre acquired "subject to the terms of this Agreement".   GSADF, ¶ 29.

The "terms of this Agreement" language was critical.  Consistent with the deal that Greehey had struck with Apache, and explained to EII and Pine, the AMI

8

Agreement stated that the leases had to be acquired for a lease bonus payment of less than $200.00 and that the leases had to be acquired on a lease format similar to that attached as Exhibit "B" to the AMI Agreement. GSADF, ¶ 30. Exhibit "B" to the AMI Agreement (the form of lease required by the AMI Agreement) provided for a primary term of five years, with a two-year option to renew. GSADF, ¶ 31.

As to the Shale Prospects, the AMI Agreement did not define when EII/Pine would be entitled to a prospect fee for net mineral acres acquired by Shale; it just stated the amount of such fee in the event one was paid. GSADF, ¶ 32.

Greehey did not and would never have agreed to simply give EII/Pine $50.00 per net mineral acres for acres that Shale acquired without the efforts or involvement of EII/Pine. GSADF, ¶ 33. Greehey does not believe it would have made any sense for Greehey to pay EII/Pine for acres where EII/Pine did nothing to acquire those acres and for which the geologic prospect fee of $25 per net acre was already to be paid. GSADF, ¶ 34.

So Sid Greehey had discussions with Chamberlain and Pine about the limited circumstances under which they would receive a prospect fee for acres acquired by Shale. Specifically:

(a)     they discussed the fact that Shale was a well-known company in the area, and that mineral owners were generally aware that Shale was putting together large blocks of land;

(b)     Greehey explained that it and Shale had already done lease checks in a large portion of the AMI, were currently negotiating leases, and had offers and leases out to a large number of lessors in the AMI;

(c)     they discussed the fact that, because mineral owners get a bonus payment up-front, but also want to have their leased property drilled (so that they can obtain royalties from the production), what should occur if the agents of EII/Pine were attempting to lease from a landowner, but the landowner was also having discussions with Shale;

(d)     the parties agreed that, in the event EII/Pine ran into a conflict with Shale, EII/Pine would cease discussions with the landowner and allow Shale to lease the property; and

(e)     in the limited circumstances where EII/Pine ran into a conflict with Shale, ceased discussions with the landowner and allowed Shale to lease the property, it was agreed that Greehey would pay $50.00 per net mineral acre for those particular leases acquired by Shale.  GSADF, ¶ 35.

Greehey did not draft the AMI Agreement.  Either EII or Pine drafted the AMI Agreement and presented it to Greehey for signature.  GSADF, ¶ 36.   The AMI Agreement did not define what acres would be considered "prospects", or contain all of the details relating to the discussions about what acres would be deemed "prospects" for purposes of paying mineral owner prospect fees.  GSADF,

¶ 37.   Because the parties had discussed the issues of prospect fees in some detail, and Sid Greehey had confidence in EII and Pine as being trustworthy, it did not occur to Greehey that the AMI Agreement needed further detail as to these issues. GSADF, ¶ 38.

EII and Pine then entered an agreement with another entity, Great Northern LLC, by which Great Northern would act as a broker on behalf of Pine and EII to assist in acquiring lease in connection with the AMI Agreement.  GSADF, ¶ 39.  As a result of conversations between Steve Pine and Great Northern (owned by Jeff Sparrow and Tom St. Peter), Great Northern understood that it would be providing services to Pine and EII as a broker, that it would buy leases on their behalf, and possibly run title.  GSADF, ¶ 41.

Remarkably, at the time that EII and Pine hired Great Northern, they did not provide Great Northern with a copy of the AMI Agreement.  Great Northern did not even see the AMI Agreement until October or November of 2012, after a dispute had arisen with respect to some leases.  GSADF, ¶ 42.   It was, therefore, not surprising that Apache later advised Greehey that it had learned that EII and Pine, through their agent, Great Northern, had been offering shorter primary terms to numerous land owners, and in fact had acquired leases that did not have an option term contained in the lease. GSADF, ¶ 48.

While Great Northern was acquiring leases, Shale was also acquiring leases, as indicated on Plaintiffs' Master Lease Spreadsheet.  (Dkt. #59-2).  The vast majority of the leases were acquired by Shale, not EII and Pine.  Id.  Additionally, other leases were acquired by Greehey directly from oil and gas companies, which leases are listed on the Master Lease Spreadsheet as coming from "UEP", "WSL", "OW", and UEP".  These entities are companies who had purchased leases in the area, and then assigned those leases to Greehey.  These are not leases acquired by EII or Pine under the AMI Agreement, and neither EII nor Pine had anything to do with the acquisition of these leases.  GSADF, ¶¶ 52-53.

To Greehey's knowledge, and based upon the Master Lease Summary produced by Plaintiffs (Dkt. 59-2), no lease was acquired for a lease bonus payment of $200.00 per net mineral acre or less.  GSADF, ¶ 43.  Likewise, based upon the Master Lease Summary produced by Plaintiffs (Dkt. 59-2), there are multiple lease acquired by EII/Pine or Great Northern on its behalf, which did not have at least five-year primary terms and/or at least a two-year option period.  GSADF, ¶ 44.

While Greehey did agree to take some leases where the bonus payment was more than $200 per acre, it was never asked by EII, Pine or anyone on their behalf if it would agree to pay a prospect fee on leases that did not meet the requirements of the AMI Agreement, specifically, the bonus limit of $200 per net mineral acre and the requirement of a five-year primary lease term and a two-year option to renew.

12

GSADF, ¶ 45.  It did not approve the payment of prospect fees for leases that did not meet the requirements of the AMI Agreement, specifically, the bonus limit of $200 per net mineral acre and the requirement of a five-year primary lease term and a two-year option to renew.  GSADF, ¶ 45.

In the late summer of 2012, Apache advised Greehey that it was only interested in acquiring leases in certain areas within the AMI.  GSADF, ¶ 46. Apache never stated that the lease terms had to change from its original request of a five-year primary term and a two-year option to renew.  GSADF, ¶ 47.

Apache did tell Greehey that it was not interested in purchasing leases that had been acquired by EII and Pine which had different, shorter lease terms. GSADF, ¶ 47.  Apache, in fact, did not acquire any of the leases that did not meet the agreed-upon requirements, and Greehey was never able to sell those leases. GSADF, ¶ 51.

EII and Pine seek just over $1 million in prospect fees (Pl. Br. in Supp. of Mot. for S.J., p. 15 (Dkt. # 58-1)) for the leases they acquired, despite the fact that none of the leases met the AMI Agreement requirement of a $200 per net mineral acre bonus payment, and only 29% of the leases met the five-year/ two-year lease terms.  GSADF ¶ 44.

EII and Pine seek just under $3 million in prospect fees (Pl. Br. in Supp. of Mot. for S.J., p. 15 (Dkt. # 58-1)) for the acres Shale acquired (with no help from

Plaintiffs), even though this was not the agreement between the parties and, in any event, <u>none</u> of these leases met the AMI Agreement requirement of a $200 per net mineral acre bonus payment.  GSADF ¶ 44.  Likewise, they seek prospect fees for leases Greehey acquired by assignment from four other oil and gas companies, even though EII and Pine had nothing to do with acquiring those leases.

### III.   <u>LEGAL ANALYSIS</u>

"Summary judgment may be granted only when, drawing all inferences and resolving all doubts in favor of the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law".  <u>Fed.R.Civ.P. 56(c)</u>; <u>Celotex Corp. v. Catrett,</u> 477 U.S. 317, 322 (1986).  This case requires the Court to consider dozens of competing facts, interpret the terms of an ambiguous AMI Agreement, determine what the parties agreed to, and then decide whether there are any material facts in dispute which preclude summary judgment.  Before addressing the basic factual disputes that preclude summary judgment, some principles of contract interpretation must be considered.

### A.   <u>Montana Rules of Contract Interpretation.</u>

Courts sitting in diversity look to the law of the forum to interpret contracts.  <u>Kominsky v. Dave Smith Chevrolet Oldsmobile Pontiac Cadillac, Inc.,</u> 2010 WL 4920903 (D. Mont. Nov 29, 2010).  The construction and interpretation of a contract is a question of law for the court.  <u>Mary J. Baker Revocable Trust v. Cenex</u>

Harvest States Cooperatives, Inc., 2007 MT 159, ¶ 19, 338 Mont. 41, 164 P.3d 851.

Courts interpret the language of a contract according to its plain, ordinary meaning.

Schwend v. Schwend 1999 MT 194, ¶ 39, 295 Mont. 384, 983 P.2d 988.  Where the

contract's language is clear and unambiguous, the rules of construction have no

application and the court's only duty is to enforce the contract as made by the

parties.  King Resources, Inc. v. Oliver, 2002 MT 301, ¶ 21, 313 Mont. 17, 59 P. 3d

1172.

But if the language of a contract is ambiguous, a factual determination must

be made as to the parties' intent in entering into the contract.  Baker, at id. citing

In re Marriage of Mease, 2004 MT 59, ¶ 30, 320 Mont. 229, ¶ 30, 92 P.3d 1148;

Klawitter v. Dettmann, 268 Mont. 275, 281, 886 P.2d 416, 420 (1994).  Ambiguity

does not exist just because a claimant says so.  Holstrom v. Mutual Benefit Health

and Accident Association, 139 Mont. 426, 428, 364 P. 2d 1065, 1066 (1961).  An

agreement is ambiguous only where the terms are susceptible to more than one

interpretation.  Van Hook v. Jennings, 1999 MT 198 ¶¶ 13, 16, 295 Mont. 409 ¶¶

13, 16, 983 P.2d 995 ¶¶ 13, 16.

In interpreting a contract, evidence of the circumstances under which the

contract was made and the matter to which it relates may be considered. Baker, at

id. citing   Mont. Code Ann. § 28-3-402 ("A contract may be explained by

reference to the circumstances under which it was made and the matter to which it

relates."); Mont. Code Ann. § 28-2-905(2), MCA ("[The parol evidence rule] does not exclude other evidence of the circumstances under which the agreement was made or to which it relates.").  Therefore, there can be evidence of the terms of the agreement other than the contents of the writing . . . (a) when a mistake or imperfection of the writing is put in issue by the pleadings.  Mont Code Ann. §§ 28-2-904 and -905(1).  As stated in the <u>Restatement (Second) of Contracts</u> § 212 cmt. b (1981): "It is sometimes said that extrinsic evidence cannot change the plain meaning of a writing, but meaning can almost never be plain except in a context." <u>Baker</u>, at ¶48.  Thus, "the circumstances under which [an instrument] was made, including the situation of the subject of the instrument and of the parties to it," § 1-4-102, MCA, may be shown and considered to aid the court in determining, as a preliminary matter, whether the instrument contains an ambiguity. <u>Baker</u>, at ¶53.

Finally, the terms of a contract are to be construed against the drafter "when the terms of an agreement or contract are uncertain or ambiguous" <u>Baker</u>, at ¶ 33.

**B.   <u>The AMI Agreement is Ambiguous Because it Does Not Define What Acres are Prospect Acres</u>.**

The AMI Agreement states the amount ($75.00) of the prospect fee per acre that EII is to receive for acres it acquires subject to the terms of the Agreement, and the amount ($50.00) of the prospect fee EII is entitled to receive for acres acquired by Greehey or Shale, again subject to the terms of the Agreement.  AMI Agreement, §1.8, Exhibit "A" to Greehey Affidavit.  While the amounts are stated, the AMI

16

Agreement fails to address what acres are considered to be prospect acres, such that any prospect fee is to be paid in the first place.

This basic omission in the contract is just the sort of imperfection in the writing that allows for the admission of parol evidence. Mont Code Ann. § 28-2-905(1). And evidence concerning the context in which the AMI Agreement was created is likewise admissible. Baker, Id.

The parties' respective positions as to what the AMI Agreement requires before any prospect fee is owed could not be more in dispute. It is Plaintiffs' position that, under the contract, they are entitled to receive a prospect fee for every acre they acquired and for every acre that Greehey (or Shale on its behalf) acquired, even though Plaintiffs had nothing to do with the acres acquired by Greehey or Shale. RPS, ¶ 11. They base this entire claim on the language in §1.8 of the AMI Agreement. Id.

By contrast, it is Greehey's position that, as to the acres acquired by Plaintiffs, no prospect fee is owed, unless the acres were acquired for a bonus payment of $200.00 or less and the lease terms provided for a five-year primary term with a two-year option to renew. RPS, ¶ 11; GSADF, ¶¶ 26-31. This is based both on the parties' discussions, GSADF, ¶¶ 26-31, and upon the plain language of the AMI Agreement. Aff. Greehey, Ex. "A" attached thereto, Ex. "A".

17

The language in § 1.8 (which sets the amount of the fee, subject to the "terms of this Agreement") must be read together with the language in §§2.1 and 2.2 (the portion of the AMI Agreement to sets the bonus payment limit and lease terms). When interpreting contracts, the whole of a contract is to be taken together so as to give effect to every part if reasonably practicable, each clause helping to interpret the other.  Mont. Code Ann. §28-3-202; <u>City of Austin, Texas v. Decker Coal Co.</u>, 701 F.2d 420, 426 (5th Cir. 1983) (interpreting Montana law); <u>Edward v. Prince,</u> 221 Mont. 272, 275, 719 P.2d 422, 424 (1986).

Greehey's interpretation is the only one that makes any sense in light of the context in which the AMI Agreement was created.  Greehey's deal with Apache was that Apache would not buy any leases that did not have the five-year/two-year lease terms.  GSADF, ¶¶ 10-14.  Why would Greehey agree to pay prospect fees for leases it could not resell, when Greehey had no intention of developing or operating the leased properties?  GSADF, ¶ 21.  In fact, it makes no sense, and Greehey explained this in detail to EII and Pine <u>before</u> the AMI Agreement was signed. GSADF, ¶ 21.

EII and Pine claim they are entitled to a prospect fee regardless whether they met the other contract terms, and they did not know about the five-year/two-year terms until after the AMI Agreement was signed.  RPS, ¶ 20.  At a bare minimum,

there is a fundamental fact dispute as to what the AMI Agreement requires before a prospect fee can be paid for any leases acquired by EII or Pine.

The dispute as to prospect fees for leases acquired by Greehey or Shale, without Plaintiffs' involvement, is even more pronounced. Plaintiffs take the remarkable position that they are entitled to $50.00 per acre (nearly $3 million in total) for acres acquired by Greehey or Shale, with no assistance from Plaintiffs. RPS, ¶ 11. In fact, the AMI Agreement is silent on when any such fees are to be paid, so parol evidence must be considered. Mont Code Ann. §28-2-905(1).

As detailed above, Greehey did not and would never have agreed to simply give EII/Pine $50.00 per net mineral acres for acres that Greehey or Shale acquired without the efforts or involvement of EII/Pine. GSADF, ¶ 33. Greehey did have discussions with Chamberlain and Pine about the limited circumstances under which Plaintiffs would receive a prospect fee for acres acquired by Greehey or Shale, and the rationale for why any such fees would be paid at all. GSADF, ¶ 35. The rationale for allowing Plaintiffs any prospect fee was to address situations where Shale landmen and Plaintiffs' landmen might be in competition to acquire the same lease. GSADF, ¶ 35. Because Shale was a large, well-known entity, there was a chance landowners would prefer to lease through it, rather than Plaintiffs. GSADF, ¶ 35. The parties agreed that, in the event EII/Pine ran into a conflict with Shale, EII/Pine would cease discussions with the landowner and allow Shale to

19

lease the property.  GSADF, ¶ 35.  In those very limited circumstances, it was agreed that Greehey would pay $50.00 per net mineral acre for those particular leases acquired by Shale.  GSADF, ¶ 35.

No language ended up in the AMI Agreement concerning when Plaintiffs were entitled to prospect fees for leases acquired by Greehey or Shale.  This ambiguity was created by Plaintiffs, as the drafter of the AMI Agreement, and the ambiguity is to be construed against them.  Baker, at ¶ 33.  These very different interpretations of the agreement between the parties create a direct fact conflict concerning whether Plaintiffs are entitled to any prospect fees from leases acquired by Greehey and Shale.  This conflict precludes summary judgment.  Plaintiffs are not entitled to $3 million in prospect fees, and they have made no effort to identify any leases for which prospect fees could be paid based on the agreement actually reached between the parties.

### C.    None of the Lease Acres Acquired Met the Express Terms of the AMI  Agreement.

As discussed above, all of the acres being acquired were being acquired for resale to Apache.  Apache set very specific terms as to the length of the leases – a five-year primary term and at least a two-year option.  These requirements were made a part of the AMI Agreement.  Section 2.2 required Plaintiffs to use a lease format attached as Exhibit "B" to the AMI Agreement.  That format contained the five-year/two-year terms.

20

Additionally, §2.1 of the AMI Agreement required that the lease bonus payments be $200.00 or less. Both this requirement, and the five-year/two-year term requirement, were necessary before Plaintiffs were entitled to any prospect fees.

Plaintiffs have produced a Master Lease Summary, which includes some of the terms of the leases. None of the leases were acquired for a bonus payment of $200.00 or less. (Dkt. 59-2). Additionally, only 29 of 101 leases acquired by Great Northern Energy as EII's agent, complied with the required five-year/two-year term. Id.

The prospect fees under the AMI Agreement were only "payable to EII subject to the terms of this Agreement". It is undisputed that Plaintiffs never complied with the requirement that lease bonus payments be for $200.00 or less. It is likewise undisputed that 71% of the EII-acquired leases did not meet the five-year/two-year term requirement. This precludes summary judgment for Plaintiffs.

In fact, Plaintiffs' admitted failure to acquire any leases for a bonus payment of $200.00 or less, as is expressly required by the AMI Agreement, dictates that summary judgment should be granted in favor of Greehey as to all claims. Fed. R. Civ. P. 56(f) allows the Court to grant summary judgment for the nonmovant, after giving notice and a reasonable time to respond. Bird v. Glacier Elec. Coop., Inc., 255 F.3d 1136, 1152 (9th Cir.2001) ("We have previously recognized that a court

21

has power *sua sponte* to grant summary judgment to a non-movant when there has been a summary judgment motion by one party and no cross-motion").

It is expected that Plaintiffs will argue that Greehey owes the prospects fees for the leases EII obtained, because it agreed to acquire those leases.  While Greehey agreed to acquire them, rather than leaving EII and Pine to deal with them, neither Greehey or Shale was ever asked by Plaintiffs if they would still pay a prospect fee for noncomplying leases, and they never agreed to pay those fees. GSADF ¶45.

The only claim Plaintiffs make which is even close to a claim that Greehey approved the payment of prospect fees is the claim that Sid Greehey told Steve Chamberlain "during preliminary settlement discussions" that Greehey would pay for disputed acres because it was working out a deal with Apache.  RPS, ¶30.  Only admissible evidence may be used in a summary judgment motion.  Briese v. Montana, 2012 WL 4929107*15 (D. Mont. 2012) (citation omitted) report and recommendation adopted by 2013 WL 788077 (D. Mont. 2013).  It is bad enough that Plaintiffs attempt to use patently inadmissible statements made during settlement discussions.  Fed. R. Civ. P. 408.  What is worse is that the statement attributed to Sid Greehey was actually made by Sam Tallis, the President of Shale. So the statement is both inadmissible and inconsequential.

At a bare minimum, there are multiple, disputed fact issues as to whether

22

Plaintiffs acquired any leases on the terms required by the AMI Agreement, and as to whether Greehey ever agreed to pay prospect fees for noncomplying leases. Summary judgment must be denied.

### D.      Plaintiffs Have Not Established a Right to Prospect Fees on Leases Acquired by Greehey and Shale.

Plaintiffs leap from the language in §1.8 stating the amount of a prospect fee for acres acquired by Greehey or Shale to a conclusion that they are entitled to nearly $3 million for doing nothing.  As discussed above, the AMI Agreement is silent as to the circumstances under which such fees could be paid.  This ambiguity was created by Plaintiffs in the drafting, and must be explained by parol evidence.

The rationale for allowing such fees and the circumstances under which they were to be paid are detailed by Greehey.  GSADF ¶¶ 23-35.  This explanation makes perfect sense in the context of the entire transaction.  Plaintiffs have no facts to the contrary, and their contention that Greehey agreed to pay them nearly $3 million for doing nothing defies common sense.  Plaintiffs likewise make no effort to identify any leases which did fit the circumstances described by Greehey, choosing instead to swing for the fences.

There are basic, fundamental fact disputes concerning whether and under what circumstances Plaintiffs may be entitled to prospect fees for leases acquired by Greehey and Shale.  The genesis of these disputes is the Plaintiffs' failure to include any language in the AMI Agreement setting forth the parties'

23

understanding.  This issue must be tried, and summary judgment cannot be granted, given the facts in dispute.

## IV.   CONCLUSION

Greehey contracted with Plaintiffs in an effort to put together a block of leases which could be resold to Apache.  Plaintiffs could earn prospect fees on the leases they acquired, so long as those leases were acquired in accordance with specific terms set for in the AMI Agreement.  At the end of the day, the deal did not work out for either side.  Greehey ended up holding a bunch of noncomplying leases that Plaintiffs acquired, which Apache would not buy.  Greehey probably should have just rejected the leases.  Plaintiffs did not get prospect fees on those leases, because their terms did not comply with the contract.

In the oil patch, everything is good until it's not.  Plaintiffs have not come close to proving they are entitled to summary judgment on their claims.  This Motion should be denied.

Dated this 21st day of May, 2015.

CRIST, KROGH, BUTLER & NORD, LLC

By:   */s/ John G. Crist*
        John G. Crist

*Attorneys for Defendant Greehey & Company, Ltd.*

24

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to L.R. 7.1(d)(2)(E), the undersigned certifies that Defendant

Greehey's Brief in Opposition to Motion for Summary Judgment complies with the

6,500 word limit of L.R. 7.1(d)(2)(A), and, in reliance on Microsoft Word Count,

contains 5,640 words, excluding caption and certificates of service and

compliance.

Dated this 21st day of May, 2015.

CRIST, KROGH, BUTLER & NORD, LLC

By:   */s/ John G. Crist*
        John G. Crist

*Attorneys for Defendant Greehey & Company, Ltd.*

25

## CERTIFICATE OF SERVICE
## L.R. 5.2(B)

I hereby certify that on the 21st day of May, 2015, a copy of the foregoing document was served on the following persons by the following means:

___1, 2___ CM/ECF
_____ Hand Delivery
_____ Mail
_____ Overnight Delivery Service
_____ Fax
_____ Email

1.    Clerk, U.S. District Court

2.    Brian D. Lee
      LEE LAW OFFICE PC
      P.O. Box 790, 158 Main Street
      Shelby, MT 59474
      Email:      brian.leelaw@gmail.com


                        CRIST, KROGH, BUTLER & NORD, LLC

                        By:   */s/ John G. Crist*
                              John G. Crist

                        *Attorneys for Defendant Greehey &*
                        *Company, Ltd.*

26